IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br><br>vs.<br><br><br>RAY ABEL ATIENZO,<br><br>Defendant. | **MEMORANDUM OPINION DENYING MOTION TO SUPPRESS**<br><br><br><br><br>Case No. 2:04-CR-00534 PGC |

This case is before the court on defendant Ray Atienzo's motion to suppress incriminating evidence against him for alleged violation of his Fourth Amendment rights. Atienzo is in this country illegally, creating the question of whether he is entitled to claim the Amendment's protections, which extend to "the People" of this country.  In an earlier decision— *United States v. Esparza-Mendoza*[1]—the court agreed with the government that previously deported alien felons illegally in this country fell outside the Amendment's coverage.  The court, however, specifically reserved the issue of whether the same conclusion would apply to someone who, while an illegal alien, was not a previously-deported felon.

---

[1] 265 F. Supp. 2d 1254, 1273-74 (D. Ut. 2003), *aff'd on different grounds*, 386 F.3d 953 (10th Cir. 2004).

The court now holds that the sole fact that someone is an illegal alien does not deprive

them of the protections of the Fourth Amendment, at least in situations where the government

does not raise any contrary argument.

## BACKGROUND

For purposes of resolving the suppression motion, the salient facts are largely undisputed.

In 1996, Atienzo illegally arrived in Price, Utah, from Mexico.  In 2000, after being convicted of

an alcohol-related driving offense and serving 30 days in jail, Atienzo was deported to Mexico.

Within months of his deportation, Atienzo returned to Price, Utah.

Several years later, on August 4, 2004, Officers Ron Colman and Patrick McLenon,

working on a Drug Enforcement Administration Task Force, were in Price, Utah, investigating a

suspected narcotics trafficking organization.  They suspected Atienzo was active in that

organization.   As part of their investigation, Officers Colman and McLenon drove to a trailer

park to investigate trailer #25.  Arriving at the trailer park, the officers identified Atienzo driving

out in a white Ford Expedition.  The officers quickly stopped Atienzo for having a faulty rear

license plate light.  Because they had received information that members of the organization

Atienzo was involved with were known to carry firearms, Officer Colman conducted a pat-down

search of Atienzo.  Atienzo readily submitted, and the officers removed his wallet.  Atienzo then

consented to a search of his wallet.  Coleman searched the wallet and placed it on the

Expedition's hood.  Looking at the wallet as it lay on the hood, Officer McLenon saw a Social

Security Card, bearing Atienzo's name.  Officer McLenon knew that Atienzo had been

previously deported, leading him to suspect (correctly) that the Social Security Card was

fraudulent.  Based on this evidence, the officers arrested Atienzo.  They then searched the Expedition incident to that arrest and with Atienzo's consent.  Among the items the officers found was a set of Ford keys.

While Officers Colman and McLenon were arresting Atienzo and searching his car, other officers were conducting a consent search of trailer #25.  During that search, officers discovered large sums of cash, firearms, and illegal drugs.  The officers also took an interest in a Ford Mustang parked directly in front of trailer #25.  Atienzo did not own the Mustang.  The officers then sought and obtained a warrant to search the Mustang.  After speaking with Officers Colman and McLenan and finding out about the Ford Keys found in Atienzo's Expedition, the officers used those keys to open the Mustang and search its contents.  Incriminating evidence was found in the car.

## DISCUSSION

Atienzo filed a timely motion to suppress under the Fourth Amendment, seeking to suppress the fraudulent social security card and, as the fruit of that card, the Ford car keys found in the Expedition.  He contends that the police exceeded the scope of a lawful traffic stop, that the police exceeded the scope of a lawful pat-down search, and that the search incident to his arrest and inventory search which uncovered the set of Ford keys was improper.  In response, the government "maintains the same position as taken in *United States v. Esparza-Mendoza*,"[2] that is, that "because [Atienzo] has been removed from the United States as an illegal alien . . . and

---

[2] 2:04-CR-534 PGC, Government's Memo. Opposing Defendant's Motion to Suppress, at 3, Docket No. 67 (D. Utah May 10, 2005) [hereinafter *Atienzo Government Memo.*]

because he thereafter illegally reentered the United States, [Atienzo] does not belong to the

community of persons to which the term 'the People' applies in the Fourth Amendment.[3]   The

government, however, also contends that this case be resolved on the narrower ground that the

law enforcement officers acted properly.  The court will address each of these questions in turn.

   I. *United States v. Esparza-Mendoza.*

Because the government maintains the same position here as it did in *Esparza-Mendoza*,

it is useful to begin by briefly reviewing that earlier case.  In 1999, Esparza-Mendoza was

deported to Mexico following his conviction in state court in Utah of a felony.[4]   He later

returned to the country illegally and, on October 27, 2002, was a witness to a domestic violence

incident involving other persons.  When police responded, they ordered him to appear for

questioning.  He appeared and the officers asked for his identification.  Esparza-Mendoza said

that he did not want to be involved and that he did not want to produce identification.  The

officers then said that they "needed" his identification and directed him to produce it.  He

submitted to this request, leading to the discovery of his identity and his arrest as an illegal alien.

After indictment on the illegal reentry charges, Esparza-Mendoza filed a motion to

suppress evidence, alleging a violation of his Fourth Amendment rights for being directed to

produce his identity.  At the conclusion of an evidentiary hearing on the matter, the court

inquired of counsel on both sides whether Esparza-Mendoza, as a previously-deported alien

---

[3] 2:04-CR-009 PGC, Government's Memo. Opposing Defendant's Motion to Suppress, at
5, Docket No. 19 (D. Utah Mar. 24, 2003) [hereinafter *Esparza-Mendoza Government Memo.*].

[4] *Id*.

felon, was able to raise a Fourth Amendment claim.  Specifically, the court noted "federal courts are under an independent obligation to examine their own jurisdiction."[5]  The court asked counsel whether Esparza-Mendoza's status posed a jurisdictional problem in resolving the suppression motion, and both sides agreed the appropriate way to proceed was to brief the issue.

The government then filed a brief arguing that because Esparza-Mendoza was a previously deported illegal alien, he did not belong to the community of persons covered by the Fourth Amendment.  Citing *United States v. Verdugo-Urquidez*,[6] the government urged that the Fourth Amendment "protects people, not places," making it "necessary [for the court] to determine who 'the People' are."[7]  Arguing that illegal aliens were not encompassed in "the People" as defined by the Constitution, the government further argued that "[s]ociety should not recognize as reasonable the privacy rights of a defendant whose presence at a scene is 'wrongful.'"[8]  Additionally, given that ties and connections to the United States were important in determining whether someone could claim Fourth Amendment protections, the government argued that "[r]estrictions placed on illegal aliens make it nearly impossible for [an illegal alien] to establish connections with the United States or to accept societal obligations."[9]

---

[5] *Qwest Comm. Int'l Inc. v. F.C.C.*, 240 F.3d 886, 891 (10th Cir. 2001) (citing *Skrzypczak v. Kauger*, 92 F.3d 1050, 1052 (10th Cir. 1996)).

[6] 494 U.S. 259 (1990).

[7] *Esparza-Mendoza Government Memo.* at 14.

[8] *Id*. at 16 (quoting *United States v. Roy*, 734 F.2d 108, 110 (2d Cir. 1984) (further citations omitted)).

[9] *Esparza-Mendoza Government Memo.* at 8.

5

Esparza-Mendoza responded that the government's reliance on the plurality opinion in *United States v. Verdugo-Urquidez*[10] was misplaced. Specifically, he argued that the key fact in *Verdugo-Urquidez* was that the challenged search took place *outside* the United States. Esparza-Mendoza argued that *INS v. Lopez-Mendoza*[11] was more on point, and that the Supreme Court had "found that the Fourth Amendment applied to illegal aliens in the United States when they were in the United States voluntarily and accepted some societal obligations."[12]

This court agreed with the government. It concluded that the police had apparently violated the Fourth Amendment, albeit inadvertently, when they demanded that Esparza-Mendoza produce identification after police had come to resolve the domestic dispute. This court found that "Esparza-Mendoza was detained—albeit briefly—without reasonable suspicion—and, therefore, in violation of his Fourth Amendment rights."[13]

But despite this violation, Esparza-Mendoza was not covered by the Fourth Amendment. After reviewing prior Supreme Court precedents and then constitutional text, history, and structure, this court ruled that an "illegal alien"[14] who had been previously convicted of a felony

---

[10] 494 U.S. 259 (1990).

[11] 468 U.S. 1032 (1984).

[12] 2:04-CR-009 PGC, Esparza-Mendoza's Memo. In Response to Government's Memo. Opposing Defendant's Motion to Suppress, at 5, Docket No. 21 (D. Utah April 4, 2003) [hereinafter *Esparza-Mendoza Defendant Memo.*].

[13] *Esparza-Mendoza*, 265 F. Supp. 2d at 1257.

[14] The court's use of the term "illegal alien" in the *Esparza-Mendoza* opinion has been criticized as "pejorative." *See* VICTOR C. ROMERO, ALIENATED: IMMIGRANT RIGHTS, THE CONSTITUTION, AND EQUALITY IN AMERICA 69 (2005) (arguing the court should have used the term "undocumented immigrant"). On this issue, the court has been guided by the advice of the

and consequently deported could not demonstrate that he is sufficiently connected to the

community so as to be considered part of "the People" entitled to rights under the Fourth

Amendment.[15]  The court began by reviewing Chief Justice Rehnquist's opinion in *Verdugo-*

*Urquidez*, which concluded that "'the People' protected by the Fourth Amendment . . . refers to a

---

nation's leading legal stylist—Brian Garner—who explains in his authoritative *Dictionary of Modern Legal Usage* that "illegal alien" is the legally precise and preferred term:

> The usual and preferable term in American English is *illegal alien*.  The other forms have arisen as needless euphemisms, and should be avoided as near-gobbledygook.  The problem with *undocumented* is that it is intended to mean, by those who use it in this phrase, "not having the requisite documents to enter or stay in a country legally.  But the word strongly suggests "unaccounted for" to those unfamiliar with this quasi-legal jargon, and it may therefore obscure the meaning.
>
> More than one writer has argued in favor of *undocumented alien*.  E.g., "An alien's unauthorized presence in the United States is not a crime under the Immigration and Naturalization Act of 1952 . . . . Thus many people find the term *undocumented alien* preferable to *illegal alien*, since the former avoid the implication that one's unauthorized presence in the United States is a crime." Elizabeth Hull, *Undocumented Aliens and the Equal Protection Clause*, 48 Brook. L. Rev. 43, 43 n.2 (1981).
>
> That statement is only equivocally correct, however: although illegal aliens' presence in the country is no crime, their *entry* into the country is.  As Justice Brennan wrote in *Plyler v. Doe*, 457 U.S. 202, 205 (1982): "Unsanctioned entry in the United States is a crime, 8 U.S.C. § 1325 . . . ."  Moreover, it is wrong to equal illegality with criminality, inasmuch as many illegal acts are not criminal. *Illegal alien* is not an opprobrious epithet: it describes one present in a country in violation of the immigration laws (hence "illegal").

BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 898-99 (2d ed. 1995).
The court is also hard-pressed to understand how the term "illegal alien" can be regarded as perjorative when *defense* counsel in this case (and in *Esparza-Mendoza*) used this term as well.  *See* Atienzo Defendant's Memo. in Support of Motion to Suppress, at 8, Docket No. 68 (D. Utah June 6, 2005); *Esparza-Mendoza Defendant's Memo*. at 5-6.  The court has simply tracked that usage.

[15] *Esparza-Mendoza*, 265 F. Supp. 2d at 1271.

class of persons who are *part of a national community* or who have otherwise *developed sufficient connection with this country to be considered part of that community*."[16]  The court also reviewed the reasons underlying *Verdugo-Urquidez*'s conclusion.  The Constitution is best viewed as a social compact between the people of the United States and its government.[17]  Accordingly, the use of the term "the People" is not a mere rhetorical flourish, but rather was a term used "to connote the political community who made a compact to govern themselves."[18]  The drafters of the Constitution would not have understood this political community to have included alien felons.

A significant part of the reasoning of *Esparza-Mendoza* rests on the fact that alien *felons* are excluded from the nation's political community.  The opinion explained that "'outrage over foreign criminals is a recurrent theme of immigration policy.'"[19]  For instance, the British practice of shipping felons to the colonies as indentured servants prompted repeated protests, including Benjamin Franklin's idea of shipping rattlesnakes to Great Britain in return.  Several colonies attempted to pass legislation barring the overseas transportation of felons, only to see the British government veto their efforts.  Following the Revolutionary War, Britain was forced

---

[16] *Esparza-Mendoza*, 265 F. Supp. 2d at 1259 (quoting *Verdugo-Urquidez*, 494 U.S. at 265 (emphasis in original)) (internal quotations omitted).

[17] *Esparza-Mendoza*, 265 F. Supp. 2d at 1263-64 (discussing *inter alia* the Mayflower Compact, the Declaration of Independence, and the Preamble to the Massachusetts Constitution of 1780).

[18] *Id.* at 1264.

[19] *Id*. at 1268 (quoting GERALD L. NEUMAN, STRANGERS TO THE CONSTITUTION: IMMIGRANTS, BORDERS, AND FUNDAMENTAL LAW (1996)).

to set up an alternative to America—prompting the establishment of the penal colony at Botany

Bay in Australia.  At this time, the states began legislating to prevent penal transportation.  In

1787, for example, Georgia enacted a statute providing that felons transported or banished from

another state or a foreign country could be arrested and removed beyond the limits of the state,

not to return on penalty of death.

     In light of these and other relevant facts, this court held "that Esparza-Mendoza—as a

previously deported felon—lacks sufficient connection to this country to assert a Fourth

Amendment suppression claim."[20]  The court, however, specifically reserved the question of

whether an illegal alien who was not a felon would likewise lack sufficient connection: "Whether

illegal aliens who have not previously been deported are distinguishable from alien felons who

have been deported is a question that can await another day."[21]  The court therefore denied the

motion to suppress, and Esparza-Mendoza pleaded guilty while reserving his right to appeal the

suppression decision.

     On appeal, the Tenth Circuit affirmed the decision on different grounds.  While noting

this court's "extensive memorandum opinion" on the Fourth Amendment's scope, the Tenth

Circuit ultimately affirmed while declining to re-examine the question.    The Circuit concluded

that, even though Esparza-Mendoza had initially declined to produce identification and had done

so only when the officer said that she "needed" to see it, this production was entirely consensual.

Therefore, the Circuit found no need to examine this court's "comprehensive analysis" of who

---

[20]  *Id.* at 1273.

[21]  *Id.*

are "the people protected by the Fourth Amendment."[22]  Instead, the court simply affirmed on the ground that police had not violated Esparza-Mendoza's rights.

## II.  Esparza-Mendoza *Does Not Extend To Illegal Aliens as a Class*

In light of *Esparza-Mendoza*, the question is now presented as to whether that decision should be extended to block illegal aliens who are not previously-deported felons from claiming Fourth Amendment protections.   As just explained, this issue was specifically reserved in *Esparza-Mendoza.*[23]  The reasoning of *Esparza-Mendoza* does not automatically require the conclusion that illegal aliens who are not felons are categorically barred as a class from asserting Fourth Amendment rights.  The opinion rests in no small part on the unique status of felons—who are generally excluded from the political process.  With respect to illegal aliens who are not felons, the decision whether they fall outside the Fourth Amendment would seem to require a case-by-case determination.  Because in this case the government does not challenge Atienzo's argument that he has sufficient connections, the court concludes that he can assert a Fourth Amendment claim.

While deported alien felons are excluded from the national community in a permanent way, the situation may be different for at least some persons who have committed no felonious criminal act other than to remain in this country illegally.  Current estimates are that at least

---

[22] *Esparza-Mendoza*, 386 F.3d at 955.

[23] *Esparza-Mendoza*, 265 F. Supp. 2d at 1273; *see also* 265 F. Supp. 2d at 1267 ("the narrow issue here is not whether these more expansive categories of aliens are covered, but whether a previously deported alien *felon* is covered" by the Fourth Amendment) (emphasis in original).

seven million persons reside in this country illegally.[24]  Only a relatively small percentage are previously deported alien felons.[25]  Obviously a class comprising millions of people presents multitudinous fact patterns that may not always be susceptible to categorical analysis.

The facts of this case will serve to illustrate the kinds of complexities that can arise in determining what kinds of connections to this country qualify as "substantial."  Atienzo arrived illegally in this country from Mexico in 1996, when he was 17-years-old.  He soon began working in coal mines in the Price, Utah area.  While employed by the mines, Atienzo received a regular paycheck that had been subject to federal and state taxes.  Atienzo testified, without contradiction, that he filed United States tax returns for 1999, 2000, 2001, and 2002.

In 1998, Atienzo returned to Mexico, but then sometime later in that same year, returned to Price.  In 1999, Atienzo was convicted of a misdemeanor driving offense and was sentenced to 30 days in jail, with subsequent deportation.  He was deported back to Mexico in 2000, but then returned again illegally to the United States approximately eight months later.  Aside from the

---

[24] Office of Policy and Planning, U.S. Immigration and Naturalization Service, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000*, at 1 ("The INS estimates that the total unauthorized immigrant population residing in the United States in January 2000 was 7.0 million.").  *See also* U.S. Dept. of Justice, Attorney General Annual Report 2002, *available at* http://www.usdoj.gov/ag/annualreports/ar2002/sg5final acctperftpt_pt1.htm ("The estimated number of illegal residents as of December 21, 1999, was reported as 6.8 million last year, but the estimate has increased to 7.0 million this year . . . .").

[25] With 7 million estimated illegal aliens and a congressionally asserted 100,000 illegal alien felons in the country, it is quite likely that of these 100,000 illegal alien felons, less than that number are actually previously deported illegal alien felons.  *See e.g.*, *Almendarez-Torres v. United States*, 523 U.S. 224, 268 (1998); 133 CONG. REC. 8772.  Indeed, even if *all* of the congressionally asserted illegal alien felons had been previously deported, that would result in 1.4% of the estimated illegal aliens being previously deported illegal alien felons.

eight-month period spent in Mexico as a result of being deported, essentially Atienzo has resided in Price continuously since 1996.

Atienzo also has family living in Price.  When he was arrested, his mother, two brothers, and three sisters were all living there.  While in Price, Atienzo fathered three children (ages seven, two, and one) with two different women (making the three children U.S. citizens).  Two of Atienzo's children are currently enrolled in school in Price (the third is not yet old enough).  While Atienzo lived separately from his children, he testified that he would often see them every day and would always see them at least five days out of every week.  Moreover, according to his testimony, Atienzo had been paying child support as ordered by the state courts.  He further testified that while he was residing with his mother at the time of his arrest, he would spend the majority of his nights with the mother of his youngest child at her residence.

 In light of these ties to Price, Utah, Atienzo arguably has sufficiently "accepted some societal obligations"[26] so to establish a substantial connection to this country.  Before reaching a firm conclusion on this point, however, the court would want to consider the matter in an adversary posture.  In this case, however, the government apparently has chosen to rely solely on the same categorical position that it took in *Esparza-Mendoza*, declining to delve into the specific facts of Atienzo's case.  The government "maintains the same position as taken in *United States v. Esparza-Mendoza*,"[27] that is, that "because [Atienzo] has been removed from the United States as an illegal alien . . . and because he thereafter illegally reentered the United

---

[26] *Verdugo-Urquidez*, 494 U.S. at 273.

[27] *Atienzo Government Memo*. at 3.

States, [Atienzo] does not belong to the community of persons to which the term 'the People' applies in the Fourth Amendment.[28]  The government's briefing does not discuss the specific facts Atienzo contends show that he has substantial connections to this country.

Having rejected the categorical position that all illegal aliens as a class lack sufficient connection to this country to assert Fourth Amendment rights, the court has no legal arguments before it disputing Atienzo's specific position that *he* has sufficient connections.  In light of the posture of the case, the simplest course is for the court to then accept the uncontested specific view that Atienzo can claim Fourth Amendment protection.

### III.   *Constitutionality of the Search*

Turning, then, to the legality of police actions in this case, Atienzo first contends that the police exceeded the scope of a lawful traffic stop.  Specifically, Atienzo argues that the officers exceeded the scope by requiring him to exit and stand in front of his car.  Such argument fails based on the settled principle that "[o]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."[29]  This principle balances the extent of the intrusion (minimal) with the legitimate concerns over an officer's safety[30]—"[w]hile a motorist retains some reasonable expectation of privacy when officer safety

---

[28] *Esparza-Mendoza Government Memo*. at 5.

[29] *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6 (1977); *see also United Sates v. Holt*, 264 F.3d 1215, 1222 (10th Cir. 2001).

[30] *Id*. at 108-11.

13

is at stake . . . the motorist's expectations are necessarily diminished."[31]  Therefore, since

Officers Colman and McLelon properly stopped Atienzo for violating a Utah traffic law,[32] they

were entitled to order Atienzo out of his car, especially in light of the officers' awareness of

Atienzo's suspected involvement in trafficking illegal drugs.

Next, Atienzo argues that the officers exceeded the scope of a lawful pat-down search

when they removed the items from Atienzo's pockets, including his wallet.  It was the removal of

his wallet that led to the discovery of a false social security card and his arrest.  It is beyond

dispute that

> [w]hen an officer is justified in believing that the individual whose suspicious
> behavior he is investigating at close range is armed and presently dangerous to the
> officer or to others, it would appear to be clearly unreasonable to deny the officer
> the power to take necessary measures to determine whether the person is in fact
> carrying a weapon and to neutralize the threat of physical harm.[33]

In short, an officer may perform a protective search—a pat-down—without a warrant when there

is reasonable suspicion that the suspect possesses a weapon.  While an officer may conduct a pat-

down search to help determine whether the suspect is in fact carrying a weapon,[34] the search must

be "limited to that which is necessary for the discovery of weapons which might be used to harm

the officers or others nearby."[35]  Notwithstanding this limitation, the Supreme Court in *Minnesota*

---

[31] *Holt*, 264 F.3d at 1222 (internal citations omitted).

[32] *See* UTAH CODE ANN. § 41-6a-1604.

[33] *Terry v. Ohio*, 392 U.S. 1, 24 (1968).

[34] *Id*.

[35] *Id*. at 26.

*v. Dickerson*[36] explained that "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context."[37]  "The rationale of the plain-view doctrine is that if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment . . . ."[38]

Here, the officer testified that while patting down Atienzo, he felt several lumps in Atienzo's pockets.  Thinking that the lumps could be weapons, Officer Colman, with Atienzo's permission, removed the items, which were bundles of money and a wallet.  The court finds that Officer Colman reasonably believed that the lumps could possibly be weapons.  It further takes "notice that knives and other small weapons can be secreted in wallets . . . ."[39]  Therefore, Officer Colman was reasonable in believing that his wallet could be dangerous and needed to be investigated.  After removing the wallet, Colman requested permission to inspect his wallet. Atienzo consented.  Atienzo has made no argument as to the voluntariness or validity of his consent to either remove the bundles of cash or wallet from his person or to inspect them.

---

[36] 508 U.S. 366 (1993).

[37] *Id*. at 375.

[38] *Id*.

[39] *United States v. Simpson*, 453 F.2d 1028, 1031 (10th Cir. 1972).

Despite gaining consent, Officer Colman did not inspect the wallet, but merely placed it on the hood of the patrol car.  According to Officer McLenon, he was able to see inside the wallet without moving it from the car's hood because of the amount of items in the wallet.  Included among the several cards found in Atienzo's wallet was a social security card.  In light of Officer McLenon's prior knowledge regarding Atienzo's illegal status, Officer McLenon arrested him for possessing a fraudulent social security card.  Because the social security card was in plain-view, coupled with Officer McLenon's prior knowledge of Atienzo's illegal status, Officer McLenon's seizure of the card was justified, as was the subsequent arrest.

The final issue is whether the Ford keys found in his car were illegally seized.  Perhaps the court misunderstands the government's position, but it appears that the government is relying almost exclusively on the proposition that the mere insertion of a key into a lock to determine the fit does not implicate a reasonable expectation of privacy.[40]  This line of argument is somewhat misplaced, in that Atienzo does not contest the actual search of the Mustang.  Instead, he contends that the government improperly seized the keys and that keys themselves (and any evidence derived from them) must be suppressed.

The government only briefly addresses the salient issue of the seizure of the keys (as opposed to the subsequent use of the keys).  It may well be that the government could have justified the seizure of the keys as part of a warrantless search of Atienzo incident to his lawful

---

[40] *See Atienzo Government Memo*. at 5-8 (citing cases such as *United States v. Lyons*, 898 F.2d 210 (1st Cir. 1990) (insertion of key into lock does not violate expectation of privacy), and *United States v. Grandstaff*, 813 F.2d 1353 (9th Cir. 1987) (same)).

arrest,[41] although this remains uncertain without specific argument from the government about the precise location of the keys.[42]   Yet, so far as the court can determine, the government's sole argument for seizing the keys rests not on the search-incident-to-arrest doctrine, but rather on the "plain view" doctrine as justification.[43]   Under the plain-view doctrine, an "item's incriminating nature is immediately apparent if [an] officer had probable cause to believe the object [is] contraband or evidence of a crime."[44]   "All that is required is a 'practical, nontechnical probability that incriminating evidence is involved . . . [and] a seizing officer need not 'know' or have an 'unduly high degree of certainty' as to the incriminatory character of the evidence under the plain view doctrine."[45]   Here there is no evidence that the keys in this case were incriminating.  As conceded to by Officer Colman, the keys never appeared to the officers to be criminal in nature or some kind of evidence of a crime.  Only after the officers heard of a Ford car being found later during the investigation did either officer begin thinking that the Ford keys in Atienzo's car could demonstrate a link between the Mustang's contents and Atienzo.

Nor are any other arguments available to the government.  The seizure of the keys cannot be justified as part of an inventory search.  To qualify as an inventory search, the search must

---

[41] *See, e.g.*, *United States v. Lugo*, 170 F.3d 996, 1003 (10th Cir. 1999); *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998).

[42] *See, e.g.*, *New York v. Belton*, 453 U.S. 454, 460 (1981) (search incident to arrest in vehicle limited to interior of passenger car).

[43] *See Atienzo Government Memo*. at 7-8.

[44] *United States v. Castorena-Jaime*, 285 F.3d 916, 924 (10th Cir. 2002) (internal quotations omitted).

[45] *Id*. (quoting *Texas v. Brown*, 460 U.S. 730, 741-42 (1983)).

have been "conducted as part of regular procedures, and for administrative rather than investigative purposes . . . ."[46]  Here there is no argument from the government that the officers conducted the search pursuant to some kind of standard policy.  Furthermore, there is no inventory form as is typically found after an inventory search.  Likewise, the search cannot be justified as a consent search.  Following the arrest, Officer Colman asked Atienzo if he could look inside his car for "weapons and drugs"—not car keys.   In sum, based on the arguments advanced to it, the court has no choice but to suppress the car keys as evidence in this case.

## CONCLUSION

In light of the government's decision not to argue otherwise, the court finds that Atienzo has established sufficient connection to the national community to be entitled to claim the protections of the Fourth Amendment.  Atienzo is entitled to suppression of car keys seized from his car without valid justification, but not to suppression of any other evidence [docket number 43].

DATED this 6th day of December, 2005.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge

---

[46] *United States v. Edwards*, 242 F.3d 928, 938 (10th Cir. 2001).

18